Adkins, J.
Difficulties of proof abound in lead paint cases, and this case is no exception. Petitioner Terrence Rogers alleges that he was poisoned by lead-based paint as a toddler when he lived in a row house owned by the Respondent Home Equity USA, Inc. (“Home Equity”). The property tested positive for lead-based paint throughout its interior in 1976—20 years before Rogers lived there. To survive summary judgment, a plaintiff must establish the subject property as a “reasonably probable source” of his lead poisoning. We are faced with the question of whether—without ruling out other possible sources of exposure—the 1976 testing, combined with other circumstantial evidence, clears that bar for Rogers.
FACTS AND LEGAL PROCEEDINGS
Terrence Rogers was born on February 28, 1994. For the first few months of his life, Rogers lived at 2328 Nevada Street in Baltimore City. In April 1994, Rogers and his mother, Toni Rogers-Coy, moved to 6149 Chinquapin Parkway (“Chinquapin”), where they lived for over two years. In October 1996, they moved to 3738 Towanda Avenue (“Towanda”), a *257 row house in northwest Baltimore and the subject property in this case.[1] After about six months, Rogers and his mother moved to 2534 Loyola Northway (“Loyola”).[2] In the first four years of his life, Rogers’ blood lead level was tested six times, with the following results:
Dato Age Blond Lend Level[3] Properly
Juno 29,1995 1 year, 4 months 7 pg/dL Chinquapin
March 25.1996 2 yours, 1 month 14 pg'dL Chinquapin
January 8.1997 2 years. 10 months 21 pg/dL Towanda
March 26,1997 3 years, 1 month 20-21 pg/dL Towanda
April 30.1997 3 years, 2 months 17 -18 pg/dL Loyola
August 22,1997 3 years, 6 months 13 pg/dL Loyola
Before the trial court, Rogers presented evidence regarding the history of Towanda, which was owned by Home Equity while he lived there. Towanda was built in 1920, when 95 percent of homes contained lead-based paint. In 1976, the Baltimore City Health Department (“the Health Department”) conducted an investigation of Towanda after a child who had lived there since birth exhibited elevated blood lead levels. Lead testing detected lead-based paint on 19 surfaces throughout the interior of the home and flaking paint on an additional seven surfaces. In October 1976, the Health Department issued an abatement card indicating that the flaking *258 paint had been corrected. Thirteen years later, in 1989, To-wanda was again referred to the Health Department because a child who lived there demonstrated elevated blood lead levels. The Health Department did not re-inspect the home, however, because the family moved shortly after the referral.
Between 1976 and 1996, the Baltimore Department of Housing and Community Development (“DHCD”) issued various building permits for construction projects at Towanda, but none described lead abatement. In 1979, the DHCD issued a permit to install a new gas boiler. In 1983, Towanda was permitted for roofing and carpentry work, plumbing repairs, and painting. Lastly, in 1994, the DHCD authorized $19,000 worth of construction to re-stucco a side wall and repair the first- and second-floor rear decks. In 2006, nine years after Rogers moved out of Towanda, the DHCD issued a permit to replace Towanda’s windows.
When Rogers’ January 8, 1997 blood test indicated a lead level of 21 (xg'/dL, the Maryland State Laboratory referred his case to the Health Department’s Childhood Lead Poisoning Prevention Program. A Health Department caseworker visited Towanda on March 17,1997 and noted that the home was in a “very dilapidated condition.” She also observed Rogers mouthing the windowsills and reported that the property contained flaking paint “all over.” After her home visit, the caseworker described the home as “condemned” and directed Rogers-Coy to move within a week. The caseworker also noted that Towanda was a suspected source of Rogers’ lead exposure.
After the same January 8, 1997 blood lead test, Rogers’ health care provider, South Baltimore Family Health Center, referred him to the Kennedy Krieger Institute Lead Poisoning Prevention Clinic (“Kennedy Krieger”). In an intake interview with Kennedy Krieger on March 26,1997, Rogers-Coy reported flaking paint on the ceiling, walls, and window frames at Towanda. She indicated that the home did not appear to be renovated and that the windows looked as if they were original to the property. She also stated that Rogers spent all of his time at Towanda, playing either inside or outside of the house. *259 During her deposition, Rogers-Coy testified that the windows and porch at Towanda had layers of chipping and flaking paint. She also testified that she often sat on the porch with Rogers when they lived there.
On May 29, 2013, Rogers filed a complaint in the Circuit Court for Baltimore City against Home Equity for negligence and unfair trade practices in violation of the Maryland Consumer Protection Act.[4] Rogers alleged that he was exposed to lead while he lived at Towanda and suffered permanent brain damage as a result. He claimed that he has undergone extensive medical treatment and will suffer “substantial” loss of wages as a result of his injuries. Rogers requested damages “in excess of $75,000,” plus costs, for each claim. Home Equity filed its answer on February 12, 2014, and the parties entered discovery.
In October 2014, Arc Environmental, Inc. (“Arc”) conducted lead testing on the exterior of Towanda. The testing found lead-based paint on the front porch, front door frame, and one exterior window. The same month, Robert K. Simon, Ph.D., a lead risk assessor and environmental toxicologist, provided a report concluding that Towanda was a “substantial contributing source of [Rogers’] lead exposure and lead poisoning during his early childhood.” To reach this conclusion, Dr. Simon relied upon a variety of documents, including deposition testimony from Rogers-Coy, Rogers’ blood lead tests, the Arc testing, and residential information collected by the Health Department, Kennedy Krieger, and the DHCD.
Jeanette R. McDaniel, M.D., a pediatrician, also filed a report concluding that Towanda was a substantial contributing factor to Rogers’ elevated blood lead levels. She opined that Rogers’ blood lead levels “rose substantially” while living at Towanda and then, as reflected in the test results, “dropped *260 upon leaving the property.” During her deposition, Dr. McDaniel testified that it takes 30 to 45 days for blood to reflect either an increase or decrease in lead exposure. Thus, she explained, Rogers’ March 26, 1997 blood lead test reflected his exposure at Towanda even if he had moved out of the property a few days beforehand. Dr. McDaniel also testified that Rogers’ April 30, 1997 blood test, which showed that his lead level dropped to 17-18 p-g/dL one month after he moved out of Towanda, indicated to her that Towanda was a source of Rogers’ lead exposure.
On December 8, 2014, Home Equity moved for summary judgment. In its motion, Home Equity argued that Rogers had not provided enough evidence to establish that Towanda was a source of his lead exposure or that any such exposure caused his elevated blood lead levels.[5] Home Equity claimed that to survive summary judgment on these two issues— source and source causation—Rogers had to rule out all other possible sources of lead exposure. At the hearing on the motion, Home Equity also contended that Rogers did not have enough evidence to show that lead exposure at Towanda caused him medical injury. In other words, it argued that Rogers could not demonstrate medical causation.
The trial court rejected Home Equity’s argument as to medical causation, but granted summary judgment on source and source causation. Although the 1976 lead testing was helpful, the court explained, Rogers did not have enough evidence “from which a jury could conclude that the same lead paint, which was present in the house in 1976 or the mid[-]1970s, remained in the house in 1996 and 1997 when [ ] Rogers was allegedly exposed.” The trial court clarified that Rogers was not required to rule out other possible sources of lead exposure, but held that he had failed to otherwise provide enough circumstantial evidence for a jury to conclude that Towanda contributed to his elevated blood lead levels.
*261 After the trial court granted summary judgment, Rogers filed a motion for reconsideration. He argued that a lead paint inspection conducted in 2007 revealed that Towanda still contained lead-based paint. Rogers attached a Lead Paint Risk Reduction Inspection Certificate from the Maryland Department of the Environment (“MDE”), which listed five categories for inspected homes, including “Lead Free” and “Full Risk Reduction.” The inspector checked “Full Risk Reduction” for Towanda, which, Rogers argued, indicated that the home was not lead free. The trial court denied Rogers’ motion for reconsideration, and he filed a timely appeal.
In a reported opinion, the Court of Special Appeals declined to decide whether Rogers had presented enough evidence that Towanda was a source of lead exposure and instead affirmed summary judgment on the issue of source causation alone. Rogers v. Home Equity USA, Inc., 228 Md.App. 620, 644, 142 A.3d 616 (2016). The intermediate appellate court explained:
[E]ven assuming, arguendo, that the other evidence was sufficient to create an inference that the Towanda Property contained lead-based paint in 1996-97, we conclude that the circuit court properly granted summary judgment on the ground that [] Rogers has not adequately demonstrated “that the Towanda Road property was the source of both lead exposure and the elevated levels measured in 1997.”
Id. Because no blood lead tests were conducted between March 26, 1996 and January 8, 1997, the court observed that the January 1997 test “could reflect a decrease in [Rogers’] blood lead levels from what it was before he moved into the Towanda Property.” Id. at 645, 142 A.3d 616. Thus, the court concluded that Rogers had not established a reasonable probability that lead at Towanda caused his elevated blood lead levels. Id. Rogers appealed.
He presented the following questions for our review:[6]
*262 1. Did the trial court err in granting Home Equity’s motion for summary judgment on the grounds that Rogers failed to establish Towanda as a reasonably probable source of his lead exposure?
2. Did the trial court err in granting Home Equity’s motion for summary judgment on the grounds that Rogers failed to establish a reasonable probability that Towanda caused his elevated blood lead levels?
*263 Because we answer both of these questions in the affirmative, we reverse the judgment of the Court of Special Appeals.
STANDARD OF REVIEW
Under the Maryland Rules, a court may grant summary judgment in favor of the moving party “if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.” Md. Rule 2—501(f). In reviewing the grant of summary judgment, appellate courts ask whether it was legally correct without deference to the trial court. Hamilton v. Kirson, 439 Md. 501, 522, 96 A.3d 714 (2014) (citations omitted). We evaluate “the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the well-plead facts against the moving party.” Id. (citations omitted). To defeat a defendant’s motion for summary judgment, the opposing party must present admissible evidence “upon which the jury could reasonably find for the plaintiff.” Id. at 522-23, 96 A.3d 714 (citations omitted). Accordingly, “general allegations which do not show facts in detail and with precision are insufficient to prevent summary judgment.” Id. at 522, 96 A.3d 714 (citations omitted).
DISCUSSION
Rogers argues that he has put forth sufficient evidence to survive summary judgment on both source and source causation. He contends that because he is not relying on a Dow v. L & R Properties, Inc., 144 Md.App. 67, 796 A.2d 139 (2002), theory of causation, he is not required to rule out other possible sources of his lead exposure.[7] Home Equity responds *264 that even if Rogers is not required to eliminate other possible sources of exposure, he has not demonstrated that it is probable—not merely possible—that Towanda caused his elevated blood lead levels.
Although not explicitly stated in his complaint, Rogers seems to have based his negligence claim upon a violation of the Housing Code of Baltimore City (1966, 1983 Repl. Vol.), §§ 702-03, 706 (“Housing Code”). Section 702 requires all occupied dwellings to “be kept in good repair, in safe condition, and fit for human habitation.” Section 703(2)(c) provides that a dwelling is in “good repair” if, in relevant part, “[a]ll walls, ceilings, woodwork, doors and windows [are] kept clean and free of any flaking, loose or peeling paint.” Section 706 provides that any “interior loose or peeling ... paint shall be removed” and prohibits the use of lead-based paint in the interior of any dwelling. Under Maryland’s common-law Statute or Ordinance Rule, Rogers can make out a prima facie case of negligence based upon a violation of the Housing Code by demonstrating (1) the violation of a section of the Housing Code “designed to protect a specific class of persons which includes the plaintiff,” and (2) “that the violation proximately caused the injury complained of.” Brooks v. Lewin Realty III, Inc., 378 Md. 70, 79, 835 A.2d 616 (2003). In Brooks v. Lewin Realty III, we held that these provisions of the Housing Code were enacted to protect children from lead-based paint poisoning. Id. at 81, 835 A.2d 616 (citation omitted).
Rogers’ Burden of Proof
To survive a motion for summary judgment, Rogers must produce enough evidence to satisfy both prongs of the Statute or Ordinance Rule to a reasonable probability. To satisfy the first prong, Rogers must demonstrate that it is reasonably probable that the subject property contained lead-based paint in violation of the Housing Code. To satisfy the *265 second prong, he must establish that it is reasonably probable that the lead in the subject property caused his elevated blood lead levels, and that his elevated blood lead levels caused him injury. In Ross v. Housing Authority of Baltimore City, 430 Md. 648, 63 A.3d 1 (2013), we described this negligence theory as requiring three separate links: “(1) the link between the defendant’s property and the plaintiffs exposure to lead; (2) the link between specific exposure to lead and the elevated blood lead levels[;] and (3) the link between those blood lead levels and the injuries allegedly suffered by the plaintiff.” Id. at 668, 63 A.3d 1. For brevity, we will refer to these links as (1) source, (2) source causation, and (3) medical causation. In this case, only source and source causation are at issue.
To defeat a motion for summary judgment, a plaintiff must demonstrate only a reasonable probability as to each of these links—he is not required to conclusively establish them. Dow, 144 Md.App. at 75, 796 A.2d 139 (citing Peterson v. Underwood, 258 Md. 9, 17, 264 A.2d 851 (1970)). In Rowhouses, Inc. v. Smith, 446 Md. 611, 133 A.3d 1054 (2016), we sought to shed light on the meaning of “reasonable probability.” We explained that “for purposes of causation in lead-based paint cases at the summary judgment phase, a reasonable probability requires a showing that is less than ‘more likely than not,’ but more than a mere ‘possibility.’ ” Id. at 655, 133 A.3d 1054 (footnote omitted). Additionally, “the subject property is a reasonable probable source of a plaintiffs lead exposure where there is a fair likelihood that the subject property contained lead-based paint and was a source of [ ] lead exposure.” Id. at 657, 133 A.3d 1054 (emphasis added).
Maryland appellate courts have recognized two ways in which a lead paint plaintiff can establish the subject property as a reasonably probable source of his lead exposure and resulting elevated blood lead levels. First, in Dow v. L & R Properties, Inc., the Court of Special Appeals held that a plaintiff can defeat a motion for summary judgment by presenting evidence that the subject property is the only possible source of the plaintiffs lead exposure. 144 Md.App. at 75-76, *266 796 A.2d 139. In other words, the plaintiff can present sufficient evidence of source and source causation through the process of elimination. The Dow plaintiff lived in the subject property “from the time she was two months old until after she was diagnosed” with lead poisoning. Id. at 75, 796 A.2d 139. The intermediate appellate court reasoned that an affidavit indicating that the plaintiff spent all of her time in the home, “coupled with the undisputed fact that homes built before 1950 often contain lead-based paint, could indeed support an inference that the paint in question contained lead.” Id. at 76, 796 A.2d 139. In Rowhouses, we explained that under a Dow causation theory, circumstantial evidence, such as testimony that prior residences did not contain flaking paint, is enough to rule out other possible sources of lead exposure. 446 Md. at 661-62, 133 A.3d 1054.
Second, a plaintiff can survive summary judgment on the issues of source and source causation by presenting evidence related solely to the subject property. If there are multiple possible sources of lead exposure, he can put forth enough evidence to establish that it is reasonably probable that the subject property contributed to his lead poisoning. The plaintiff can “rule in” the subject property as a reasonably probable source through either direct or circumstantial evidence. Kirson, 439 Md. at 527-28, 96 A.3d 714 (citations omitted).
Under this second theory of causation, the plaintiff is not required to eliminate all other possible sources of lead exposure. Id. When a plaintiff may have been exposed to lead in multiple properties, his burden of proof does not change— he is still only required to show that the subject property was a reasonably probable source of his injury-causing exposure. Id. As the Court of Special Appeals explained in Hamilton v. Dackman, 213 Md.App. 589, 75 A.3d 327 (2013), when a trial court is evaluating a defendant’s motion for summary judgment, the question is “not whether the [subject] property is the probable source, but whether it is a probable source of the lead paint that allegedly caused [the plaintiffs] injuries.” Id. at *267 617, 75 A.3d 327 (emphasis in original). The court further explained that, as a matter of law, it is possible for a plaintiff to “create a genuine issue of fact that a property probably was responsible for something less than all of a plaintiffs demonstrated lead exposure.” Id. at 616, 75 A.3d 327.
Source: Rogers’ Lead Exposure
Rogers presented the following evidence to support his claim that he was exposed to lead-based paint at Towanda: (1) Towanda was built in 1920, when 95 percent of homes contained lead-based paint; (2) a 1976 Health Department report on Towanda documenting lead-based paint on 19 interi- or surfaces and requiring corrective action as to seven additional interior surfaces with flaking paint; (3) a note that acknowledged corrective action had been taken as to the flaking paint, but did not mention the 19 surfaces with lead-based paint; (4) building permits that show construction at Towanda between 1976 and 1996, but do not indicate a gut rehabilitation that would have fully abated the lead-based paint; (5) a 1989 Health Department referral for a child with elevated blood lead levels living at Towanda; (6) Rogers’ January 8, 1997 and March 26, 1997 blood tests, which show an elevated blood lead level of 20-21 i¿g/dL while he resided at Towanda; (7) a 1997 Health Department file in which a caseworker noted that Towanda was in a “dilapidated” condition; (8) a 1997 Kennedy Krieger intake interview where Rogers-Coy indicated that the home did not appear to be renovated and that Rogers spent all of his time at Towanda while he resided there; (9) deposition testimony from Rogers-Coy that Towanda’s windows and porch had layers of cracked paint; (10) a building permit that shows new windows were installed at Towanda in 2006; (11) a 2007 MDE Lead Paint Risk Reduction Inspection Certificate that did not certify the home as lead free; and (12) a 2014 Arc report documenting lead-based paint on the exterior of Towanda. Rogers argues that this evidence, viewed in the light most favorable to him, establishes Towanda as a reasonably probable source of his lead exposure.
*268 Home Equity asserts four arguments to support its position that summary judgment was properly granted as to source. First, Home Equity argues that because Rogers has not presented direct evidence of lead-based paint in the property at the time he resided there, Rogers is required to rule out other possible sources of lead exposure to make out a prima facie case of negligence. This argument misstates the law. As discussed supra, to survive summary judgment, Rogers must demonstrate that Towanda was a reasonably probable source of lead exposure. To satisfy this requirement, he can use direct evidence, circumstantial evidence, or both. Kirson, 439 Md. at 537-38, 544, 96 A.3d 714. His burden of proof remains the same regardless of the type of evidence he uses to meet it. Accordingly, Rogers’ use of circumstantial evidence does not require him to eliminate all other possible sources to survive summary judgment.
Second, Home Equity argues that Dr. Simon impermissibly concluded that Towanda was a source of lead exposure due to the age of the home. Home Equity points to Kirson for its assertion that the age of a home cannot give rise to a reasonable inference of lead-based paint. In Kirson, we affirmed summary judgment in two consolidated cases. In one case, Hamilton v. Kirson, two expert witnesses testified that the subject property was a source of the plaintiffs’ lead exposure based on the age of home, positive exterior lead testing, the mother’s testimony that the children mouthed paint chips, and the children’s elevated blood lead levels while they lived in the home. Id. at 518, 543, 96 A.3d 714. We held that this circumstantial evidence was not enough to establish the subject property as a reasonably probable source of the plaintiffs’ lead exposure without ruling out other possible sources. Id. at 544, 96 A.3d 714. We explained that a presumption that houses of a certain age contain lead-based paint is “insufficient for an expert to reach the conclusion that the interior of a specific property contained lead-based paint during the relevant time period.” Id.
In this case, however, Dr. Simon reached his conclusion that Towanda was a source of Rogers’ lead exposure based on a *269 robust record, including the 1976 testing, the 1989 referral to the Health Department, and notes from the Health Department’s 1997 home visit.[8] Although his report indicated that houses built before 1950 “would most likely contain lead-based paint [ ], unless proven negative by testing,” Dr. Simon did not rely on this inference to reach his conclusion. Dr. Simon had direct evidence that Towanda contained lead-based paint in 1976—he did not have to infer the presence of lead from the age of the property. Dr. Simon formulated his opinion based largely on the 1976 testing and the 1997 Health Department records describing Towanda’s poor condition. He testified that the 1976 testing showed that lead-based paint was on “basically everything inside the house,” and that the Health Department’s description of Towanda as “dilapidated” in 1997 suggested that it was “extremely unlikely” that the lead-based paint had been fully abated. Rogers has presented sufficient evidence for both Dr. Simon and a jury to reasonably infer that Towanda still contained lead-based paint in the mid-1990s, without improperly relying on the age of the home.
Third, Home Equity contends that the 2014 exterior testing cannot give rise to a reasonable inference that Towanda’s interior contained lead-based paint in 1996 and 1997. This may be so. See id. at 543-44, 96 A.3d 714 (“[T]o even enter the realm of ‘substantial contributing source,’ a house has to be shown to have had lead-based paint—almost invariably in the interior of the building.” (emphasis in original)); Dackman, 213 Md.App. at 603, 75 A.3d 327. But Rogers is not relying on the exterior testing as the mainstay of his claim. Rather, he has produced extensive circumstantial evidence, including the 1976 interior test, which allows a reasonable inference that the interior of Towanda exposed Rogers to lead paint.
*270 Lastly, Home Equity argues that Rogers has not presented enough evidence overall to establish Towanda as a reasonably probable source of lead exposure, and thus summary judgment was properly granted on those grounds. Specifically, Home Equity argues that due to the construction projects that took place at Towanda after 1976, including painting, is it not reasonable to infer that the same lead paint that covered the walls in the 1970s poisoned Rogers in the 1990s. It contends that Rogers’ circumstantial evidence “is insufficient to ‘rule in’ the Towanda Property.” We disagree. As discussed supra, Rogers’ case is distinguishable from Kirson, in which we held that the plaintiffs had not presented sufficient evidence to establish the subject property as a reasonably probable source of their lead exposure. 439 Md. at 544, 96 A.3d 714. Additionally, the quality and quantity of circumstantial evidence in the record before us distinguishes Rogers’ case from Dackman, 213 Md.App. 589, 75 A.3d 327, and Taylor v. Fishkind, 207 Md.App. 121, 51 A.3d 743 (2012), in which the Court of Special Appeals affirmed the trial courts’ grants of summary judgment on the issue of source.
In Dackman, the plaintiff exhibited elevated blood lead levels during the time his father lived in the subject property, and he was observed mouthing paint chips when he visited and sometimes stayed overnight. 213 Md.App. at 592, 594, 75 A.3d 327. Testing detected lead-based paint above an exterior door. Id. at 618, 75 A.3d 327. The Court of Special Appeals held that this evidence was insufficient to establish the property as a reasonably probable source of the plaintiffs lead exposure. Id. at 618-19, 75 A.3d 327. The court adopted the analyses of the trial court that: (1) “[tjhere is no basis for the logical inference that lead in the exterior paint of the house necessarily means it was present in the interior of the house”; and (2) “[t]he fact that lead was found at only one of eight tested locations on the exterior of the house only reinforces the risks of inferring the presence at one location from the presence of lead at a different location.” Id. at 603, 75 A.3d 327. The Court of Special Appeals concluded that the plaintiff had only estab *271 lished a possibility—not a probability—that he was exposed to lead at the subject property. Id. at 618, 75 A.3d 327.
Unlike the plaintiff in Dackmcm, Rogers has presented enough evidence to advance Towanda across the line from a mere possible source of lead exposure to a reasonably probable source of lead exposure. The 1976 interior lead testing, paired with the lack of evidence showing full lead abatement, gives rise to a reasonable inference that Towanda’s interior still contained lead-based paint when Rogers lived there. Additionally, the 2014 exterior testing revealed lead-based paint on four surfaces, including the porch where Rogers often played, as opposed to only one, out-of-reach surface in Dock-man.
Finally, the plaintiff in Dackman divided his time between the subject property and his mother’s house. In that case, it was possible that another property, where the plaintiff was spending time concurrently, was causing his elevated blood lead levels. Here, Rogers spent all of his time at Towanda during the six months he lived there. There are no possible concurrent sources of exposure. Home Equity argues that Rogers’ elevated blood lead levels in January and March of 1997 were due to the lingering effects of his exposure at Chinquapin. But Dr. McDaniel testified that a child’s blood lead level will decrease about 30 to 45 days after an exposure has ended. Based on her testimony, it is reasonable to infer that if Towanda was not a source of lead exposure, Rogers’ blood lead level would have decreased between January and March 1997. Instead, it remained elevated until he moved out of Towanda. Thus, a jury could reasonably conclude that Towanda was exposing Rogers to lead.
Rogers’ case is also distinguishable from Taylor v. Fishkind. In Taylor, the Court of Special Appeals affirmed the trial court’s grant of summary judgment when the plaintiff was unable to rule out other possible sources of lead and presented “scant evidence” that she was exposed to lead-based paint in the subject property. 207 Md.App. at 142, 51 A.3d 743. The plaintiff put forth evidence that the property was built *272 before 1913 and had not been fully rehabilitated since. Id. at 143, 51 A.3d 743. She demonstrated elevated blood lead levels and mouthed paint chips while she lived in the property. Id. at 125, 129, 51 A.3d 743. Testing detected lead-based paint on an exterior window apron. Id. at 129, 51 A.3d 743. The intermediate appellate court explained that this evidence did not support the plaintiffs assertion that the home contained lead-based paint. Id. at 144, 51 A.3d 743. For a jury to conclude that the house was a reasonably probable source of the plaintiffs lead exposure, it would have to rely on the impermissible assumption that old homes contain lead paint. Id. Furthermore, the plaintiffs blood lead level declined from 17 ¡xg/dL to 7 gg/dL while she lived in the subject property. Id. at 125, 51 A.3d 743.
In the case before us, the evidence Rogers has presented to support the conclusion that Towanda contained lead-based paint cannot be described as “scant.” Rogers has presented evidence that the interior of Towanda—not only the exterior— contained lead-based paint. The 1976 interior testing is particularly persuasive when viewed in light of the law at the time, which only required landlords to abate lead paint within four feet of the floor. See Ronald Fishkind Realty v. Sampson, 306 Md. 269, 278, 508 A.2d 478 (1986). Furthermore, the building permits issued between 1976 and 1996 suggest that Towanda was never fully rehabilitated. Indeed, the Court of Special Appeals explained in Taylor that “[i]f the property contained lead-based paint when it was originally constructed, then lack of evidence of a gut rehabilitation prior to [the plaintiff] living there would support the conclusion that the property still contained lead-based paint when [she] lived there.” 207 Md.App. at 144, 51 A.3d 743. Additionally, Rogers’ blood lead levels remained elevated throughout his residence at Towanda. They did not begin to decline until he moved out of the property.
Construing all reasonable inferences in favor of Rogers, we hold that he has presented sufficient evidence to establish Towanda as a reasonably probable source of lead exposure. *273 Thus, summary judgment was improperly granted on this issue.
Source Causation: Cause of Rogers’ Elevated Blood Lead Levels
In addition to demonstrating that Towanda was a reasonably probable source of Rogers’ lead exposure, Rogers must also demonstrate source causation—a reasonable probability that his exposure at Towanda contributed to his elevated blood lead levels. Because Rogers has not attempted to rule out other possible sources of his lead exposure, he must present enough evidence to “rule in” Towanda as a contributing source. See Rowhouses, 446 Md. at 648-49, 183 A.3d 1054 (quoting Dackman, 213 Md.App. at 616-17, 75 A.3d 327). In other words, he must demonstrate that it was a substantial contributing factor to his injury. See Ross, 430 Md. at 668, 63 A.3d 1.
The Court of Special Appeals first applied the substantial factor analysis in a lead paint case in Bartholomee v. Casey, 103 Md.App. 34, 651 A.2d 908 (1994). It explained, “Where the conduct of a defendant was a substantial factor in bringing about the suffering of an injury, such conduct will be deemed to have ‘caused’ the injury.” Id. at 56, 651 A.2d 908 (emphasis added) (quoting W. Page Keeton et al., Prosser and Keeton on Torts, § 41, at 266-68 (5th ed. 1984 & Supp. 1988)). We adopted this reasoning in Ross, where we elaborated:
To be a substantial factor in causing [the plaintiffs] injuries, the [subject property] must have been a source of [the plaintiffs] exposure to lead, that exposure must have contributed to the elevated blood lead levels, and the associated increase in blood lead levels must have been substantial enough to contribute to her injuries.
430 Md. at 668, 63 A.3d 1.
Home Equity argues that because Rogers has admitted that his previous residence, Chinquapin, was a reasonably probable source of his lead exposure, he has only established a possibility—not a probability—that Towanda also contributed to his *274 elevated blood lead levels. It relies on Peterson v. Underwood for the proposition that to survive summary judgment, Rogers must produce more evidence on source causation. In Peterson, the Court explained:
[T]he plaintiff produces legally sufficient proof to get to the jury once he shows it is more probable than not that the defendant’s act caused his injury. This does not mean plaintiff is required to exclude every other possible cause of the accident. But where plaintiff by his own evidence shows two or more equally likely causes of the injury, for only one of which defendant is responsible, plaintiff [cannot] recover.
Peterson, 258 Md. at 17, 264 A.2d 851 (emphasis added) (citations omitted). Home Equity argues that Rogers has presented two equally likely causes of his injury: Chinquapin and Towanda. Thus, he cannot recover from Home Equity. But Peterson’s reasoning does not apply in the lead paint context.
In Rowhouses, we explicitly rejected the “more probable than not” standard for lead paint cases. We held that, “for purposes of causation in lead-based paint cases at the summary judgment phase, a reasonable probability requires a showing that is less than ‘more likely than not.’ ” Rowhouses, 446 Md. at 655, 133 A.3d 1054 (emphasis added). We explained, “[T]here are degrees of probability, with more likely than not having the highest degree of probability, followed by reasonable probability, followed by mere possibility.” Id. In a lead paint case, a plaintiff is not required to show that one source of his lead exposure contributed to his injury to a greater degree than another. See Kirson, 439 Md. at 544, 96 A.3d 714 (explaining that a plaintiff can survive summary judgment without evidence as to other possible sources of lead exposure). Once a plaintiff has established a property as a reasonably probable source of his lead exposure, a defendant cannot avoid liability by pointing to other properties that also exposed the plaintiff to lead. A plaintiff can demonstrate more than one reasonably probable source of injury-causing lead exposure and still survive summary judgment.
*275 Rogers presents the following evidence to show that Towan-da was a reasonably probable source of his elevated blood lead levels: (1) his blood tests demonstrating an elevated lead level of 21 |xg/dL in January 1997 and 20-21 (ig/dL in March 1997; (2) his April 30, 1997 test, which read 17-18 gg/dL, and his August 22, 1997 test, which shows a further decline to 13 |xg/dL; (3) Dr. McDaniel’s testimony that it takes 30 to 45 days after the exposure has ended for the level of lead in a child’s blood to decrease; (4) a 1997 Health Department caseworker’s report that she observed Rogers mouthing a windowsill during a home visit; (5) the 2014 Arc exterior testing that found lead-based paint on the porch, where Rogers-Coy testified that she sat with Rogers;[9] (6) Dr. Simon’s conclusion that “to a reasonable degree of scientific probability ... Towanda ... was a substantial contributing source of [ ] Rogers’ lead exposure and lead poisoning during his early childhood”; and (7) Dr. McDaniel’s report, which stated “with a high degree [of] medical probability” that Towanda “was a substantial contributing factor to his elevated lead levels.” Rogers contends that this evidence is sufficient to establish Towanda as a reasonably probable cause of his elevated blood lead levels.
Focusing on the timing of Rogers’ blood tests, Home Equity argues that because of the gap in blood lead testing between March 25, 1996 and January 8, 1997, it is impossible to know whether Rogers’ blood lead levels increased when he moved to Towanda. The gap in blood lead testing is illustrated with dashed lines in the chart below:
*276 [[Image here]]
Home Equity contends that because Rogers initially exhibited elevated blood lead levels at Chinquapin, his January 1997 and March 1997 blood lead tests just reflect the continuing effects of the Chinquapin exposure. To demonstrate a reasonable probability that Towanda contributed to his elevated lead levels, Home Equity argues that Rogers must “show a reasonable probability that the 21 |j,g/dL measurement represents an increase over his blood lead level before he moved to [Towan-da.]” Again, we disagree.
To reach a jury, Rogers must only show that it is reasonably probable that Towanda contributed to his elevated lead levels—he does not have to demonstrate that his lead level increased when he moved in. As the Court of Special Appeals explained in Dackman, “[T]he fact that a lead-exposed child might have lived or spent time in more than one lead-based-painted property should not foreclose that child as a matter of law from pursuing any one of those potential sources—as long as he is able to rule in the subject property .... ” Dackman, 213 Md.App. at 616, 76 A.3d 327 (emphasis in original). Although Rogers cannot prove that his blood lead levels increased when he moved to Towanda, they remained elevated without decrease while he lived there. Dr. McDaniel testified that once Rogers was no longer exposed to lead, his blood lead levels would decrease after about 30 to 45 days. *277 From this, a jury could reasonably infer that if Towanda was not a contributing source, his March 1997 lead level would have been lower.
To explain Rogers’ declining lead levels after he moved out of Towanda, Home Equity argues that they were part of a larger declining trend that began once Rogers left Chinqua-pin. In essence, Home Equity contends that because Chinqua-pin was almost certainly a source of exposure, Rogers’ blood lead level continued to rise after the March 1996 test. Then, when Rogers moved to Towanda, his blood lead level began to decrease because he was no longer being exposed to lead. But, in a summary judgment context, this argument is thwarted by Dr. McDaniel’s testimony that blood lead will dissipate after about 30 days, the amount of time between the March 1997 and April 1997 blood tests. Viewing this evidence in the light most favorable to Rogers, a jury could reasonably infer that his blood lead level declined in April 1997 because he had left the source of his exposure, which was Towanda.
We hold that Rogers has presented sufficient evidence to demonstrate that Towanda was a reasonably probable cause of his elevated blood lead levels, and that summary judgment was improperly granted on this ground.
CONCLUSION
Rogers has presented sufficient circumstantial evidence to establish Towanda as a reasonably probable source of his injury-causing lead exposure. Therefore, summary judgment was improperly granted on the issues of source and source causation. Accordingly, we reverse the judgment of the Court of Special Appeals.
JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. COSTS TO BE PAID BY RESPONDENT.

. Before the trial court, Home Equity USA, Inc. ("Home Equity”) argued that Terrence Rogers did not move to 3738 Towanda Avenue ("Towanda”) until January 1997 and that he admitted this fact through his failure to respond to requests for admissions. But during oral argument before this Court, Home Equity, through counsel, accepted Rogers’ move-in date as October 1996 for the purposes of summary judgment.

. The exact date Rogers moved out of Towanda is unknown. Rogers’ mother, Toni Rogers-Coy, testified that they moved out of Towanda around April 1997. Records from Kennedy Krieger’s Lead Poisoning Prevention Clinic indicate that Rogers-Coy and her son moved out of Towanda on March 29, 1997. After a home visit on March 17, 1997, the Baltimore City Health Department noted that Rogers-Coy "must move by end of week,” which was March 21, 1997.

. Blood lead is measured in micrograms per deciliter (“gg/dL”).

. Rogers also filed suit against the owners of 6149 Chinquapin Parkway ("Chinquapin”) and the realty company that managed that property. In June 2014, the court dismissed Rogers' claims against the realty company due to a lack of jurisdiction. In October 2014, Rogers’ claims against Chinquapin’s owners were voluntarily dismissed without prejudice.

. Home Equity also argued that Rogers lacked standing to bring his unfair trade practices claim. Rogers agreed that summary judgment should be entered for Home Equity on that claim.

. We have consolidated the questions presented in Rogers’ Petition for a Writ of Certiorari. His petition included the following questions:
1, Can a Maryland appellate court decline to resolve the correctness of the reasoning of the trial court when granting summary judgment, *262 and then affirm the judgment relying on a different factual basis [than] relied upon by the trial court, if the trial court had discretion to deny summary judgment, the alternative basis required resolution of critical facts in dispute, and the appellate court rendered its decision without the benefit of a complete record?
2. Was it improper for the Court of Special Appeals to affirm the grant of summary judgment on a factual basis not relied upon by the trial court, when the factual support was first presented to the trial court by the Respondent during the hearing on summary judgment, not allowing Petitioner a proper amount of time to adequately ensure the record was factually complete as to this issue?
3. Was it improper for the Court of Special Appeals to affirm the grant of summary judgment relying upon a medical expert’s opinion stated during her deposition, that in turn relied upon the resolution of a material fact in dispute, when the trial court did not rely upon this opinion as a reason for granting summary judgment, the issue could only be determined by resolving disputes of fact, and the court record only contained eleven non-consecutive pages of the doctor’s deposition transcript, and did not reflect the medical doctor’s entire causation opinion? '
4. Was it error for the Court of Special Appeals to invade the province of the jury and make a determination of fact that the record "does not reflect, as [Rogers] asserts, evidence that his blood lead levels increased while he was residing at the Towanda Property[,]” when the record contains an abundance of evidence that the Towanda Property was a reasonably probable source of Petitioner's lead exposure and elevated blood lead levels, not relied upon or considered by the Court of Special Appeals when affirming the judgment?
5. Did the trial court err in granting Petitioner’s Motion for Summary Judgment, and abuse the court's discretion in denying Petitioner’s Motion for Reconsideration, on the ground that Petitioner failed to establish that the Towanda Property contained lead-based paint during Petitioner’s residency in 1996 and 1997, despite evidence of a prior lead test for the property in 1976, and therefore, Petitioner failed to meet his burden of proof that the Towanda "property was the source of both lead, exposure and the elevated levels measured in 1997”?

. Rogers also puts forth a number of procedural arguments regarding the Court of Special Appeals opinion. Rogers argues that the intermediate appellate court erred by: (1) affirming the trial court's grant of summary judgment on source causation rather than source; (2) relying on Dr. McDaniel’s deposition testimony; (3) assuming Rogers’ Towan-da move-in date as undisputed fact; and (4) failing to remand the case *264 for the trial court to develop the record. Because we reverse the Court of Special Appeals on other grounds, we decline to reach these arguments.

. In his report, Dr. Robert K. Simon indicated that he also relied upon Housing Authority of Baltimore City (“HABC”) records that documented continued abatement at Towanda between 2008 and 2013. He reasoned that if the property required abatement work during this time, the home must not have been fully abated in the 1990s, when Rogers lived there. These HABC documents are not in the record before us.

. Home Equity claims that Rogers is not permitted to raise this argument on appeal because it was not asserted before the trial court. See Md. Rule 8-131(a). We disagree. Both pieces of evidence that support his assertion were presented below. The 2014 Arc Environmental, Inc. report and Rogers-Coy's testimony regarding the porch were attached to Rogers’ response to Home Equity’s motion for summary judgment. Additionally, before the trial court, Rogers argued that he was exposed to lead paint when chips and dust from the porch were tracked into the house.