*Homer Walton, et al. v. Premier Soccer Club, Inc., et al.*, No. 11, September Term, 2024. Opinion by Gould, J.

**NEGLIGENCE BASED ON A VIOLATION OF A STATUTE OR ORDINANCE – ELEMENTS**

The Supreme Court of Maryland held that, to establish a prima facie case of negligence based on a violation of a statute or ordinance, the plaintiff must present evidence that: (1) the defendant violated the statute or ordinance designed to protect a specific class of persons that includes the plaintiff, and (2) the violation of the statute or ordinance proximately caused the plaintiff's injury.

**NEGLIGENCE BASED ON A VIOLATION OF A STATUTE OR ORDINANCE – PROXIMATE CAUSE**

The Supreme Court of Maryland held that while the violation of a statute or ordinance designed to protect a specific class of persons that includes the plaintiff is evidence of negligence, to survive summary judgment, the plaintiff must provide sufficient evidence to establish the causation-in-fact and legal causation components of proximate cause.

Circuit Court for Baltimore County
Case No.: C-03-CV-19-004228
Argued: October 2, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 11

September Term, 2024

_____

HOMER WALTON, ET AL.

v.

PREMIER SOCCER CLUB, INC., ET AL.

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Opinion by Gould, J.
Watts, J., dissents

_____

Filed: April 24, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This case requires us to revisit the element of proximate cause in a negligence claim. Sydney Walton, at the age of fourteen, suffered a concussion and other head injuries when, after colliding with another player, she fell and struck her head during an indoor soccer practice at a Baltimore County-owned facility. In the litigation seeking damages for her injuries, the plaintiffs advanced several theories of negligence, some of which were rejected by a jury after an eight-day trial. Those theories are not before us. The negligence theory at issue here was based on allegations that the defendants violated a Maryland statute enacted to ensure that parents, players, and coaches in youth sports are provided information about the risk of concussions and best practices for preventing and handling them. The circuit court granted summary judgment in favor of the defendants on this claim.

The violation of a statute or ordinance may provide evidence of negligence, but to sustain the negligence claim, the plaintiff must establish proximate cause. *Brown v. Dermer*, 357 Md. 344, 358-59 (2000), *overruled in part on other grounds by Brooks v. Lewin Realty III, Inc.*, 378 Md. 70 (2003), *abrogated on other grounds by Ruffin Hotel Corp. of Md., Inc. v. Gasper*, 418 Md. 594 (2011). A prima facie case of negligence based on the violation of a statute or ordinance has two prongs: (1) the plaintiff must present evidence that the defendant violated a statute or ordinance designed to protect a specific class of persons that includes the plaintiff; and (2) the plaintiff must present evidence that the violation of the statute or ordinance proximately caused the plaintiff's injury. *Brooks*, 378 Md. at 79. We have sometimes called this the "Statute or Ordinance Rule." *Blackburn Ltd. P'ship v. Paul*, 438 Md. 100, 111 (2014).

In certain contexts, we have said that proximate cause is established under this rule if: (1) the plaintiff is within the class of people that the statute or ordinance was enacted to protect; and (2) the harm suffered by the plaintiff is the type of harm the drafters of the statute or ordinance meant to prevent. *Hamilton v. Kirson*, 439 Md. 501, 524 (2014); *Kiriakos v. Phillips*, 448 Md. 440, 463 (2016). The issue here is whether a plaintiff can survive a summary judgment motion on the issue of proximate cause by satisfying the two parts of that formulation, or whether evidence establishing the cause-and-effect relationship between the statutory violation and the alleged injuries is also required. The circuit court chose the latter approach when it granted summary judgment to the defendants, finding that the plaintiffs produced no evidence that Sydney's collision was, in fact, caused by the alleged statutory violations. In a well-reasoned reported opinion, the Appellate Court of Maryland affirmed. *Walton v. Premier Soccer Club, Inc.*, 261 Md. App. 53 (2024).

The Waltons petitioned this Court for a writ of certiorari, which we granted. *Walton v. Premier Soccer Club, Inc.*, 487 Md. 212 (2024). For the reasons explained below, we affirm the judgment of the Appellate Court.

## I

### A

In 2011, the General Assembly enacted legislation addressing concussions in youth sports. *See* 2011 MD. LAWS, ch. 548 (S.B. 771), preamble; 2011 MD. LAWS, ch. 549 (H.B. 858), preamble. The purpose clauses of both bills expressed numerous objectives, including the development and dissemination of materials created by the Maryland State

2

Department of Education (the "Education Department") to raise awareness among youth athletes, coaches, parents, and others about "the risk of concussions and head injuries[,]" best practices for handling actual or suspected concussions, and protocols for determining whether a player is fit to return to the field of play. 2011 MD. LAWS, ch. 548 (S.B. 771), purpose; 2011 MD. LAWS, ch. 549 (H.B. 858), purpose. These bills were codified in section 7-433 of the Education ("ED") Article and section 14-501 of the Health-General ("HG") Article of the Maryland Annotated Code.

Under section 7-433(b)(1), the Education Department was required to "develop policies and implement a program" addressing: (1) concussion risks; (2) criteria for removal and return to play; (3) risks of not reporting head injuries and of continuing to play after injury; and (4) appropriate academic accommodations for injured students. The Education Department was also required to create "a concussion and head injury information sheet" for public school students and their parents or guardians. ED § 7-433(b)(3)(i). To comply with this obligation, the Education Department published a document entitled "Policies and Programs on Concussions for Public Schools and Youth Sport Programs" (the "Concussion Policies").[1] Md. State Dep't of Educ., *Policies and Programs on Concussions for Public Schools and Youth Sport Programs* (Updated 2012).

---

[1] The requirements of ED § 7-433 and HG § 14-501 are implemented under Title 13A, Subtitle 6, Chapter 8 of the Code of Maryland Regulations ("COMAR"), with the goal of "establish[ing] a program of concussion awareness and prevention throughout the State of Maryland for student-athletes, their parents or guardians, and their coaches." COMAR 13A.06.08.01. COMAR incorporates by reference the Concussion Policies, thus giving such policies the force of any properly promulgated regulation. COMAR 13A.06.08.03.

The Concussion Policies cover, among other topics, recognizing and treating concussions and specifying the criteria under which athletes can safely return to play.

The General Assembly expanded the use of the Concussion Policies beyond schools through HG § 14-501. Under this section, "youth sports program[s]"[2] must make the Concussion Policies available to coaches, youth athletes, and parents/guardians, HG § 14-501(b)(1), and coaches must review these policies, *id.* § 14-501(b)(2). Athletes with suspected concussions must be removed from play until cleared by a qualified healthcare provider. *Id.* § 14-501(c). Before a youth sports program can use a local government facility, the government must notify the program of its obligations under HG § 14-501. *Id.* § 14-501(d).[3]

**B**

On December 13, 2017, Sydney,[4] then age fourteen, was injured during her soccer team's practice at the Northeast Regional Recreation Center (the "rec center") owned by Baltimore County.[5] While practicing on Field 2, Sydney collided with another player, fell,

---

[2] A "youth sports program" is a "program organized for recreational athletic competition or instruction for participants who are under the age of 19 years." HG § 14-501(a)(5).

[3] The defendants contend that HG § 14-501 does not apply in this case. Because the circuit court assumed that this section applied when it granted summary judgment, we will also do so. Whether it does apply in such circumstances will be a question for another day.

[4] By using her first name for the sake of simplicity, we mean no disrespect to Sydney Walton.

[5] The defendants disputed that their conduct was unlawful or improper, and many of these facts were put before the jury which returned a defense verdict. But because we

and struck her head against a wooden boundary wall. As a result, she sustained a concussion and other serious, permanent injuries.

Two years after the incident, the Waltons filed a complaint in the Circuit Court for Baltimore County, alleging four counts of negligence. Their second amended complaint was the operative pleading when the circuit court made the summary judgment rulings at issue in this appeal.[6] The Waltons named multiple defendants,[7] including Sydney's team, Premier Soccer Club, Inc. ("Premier") and its coach, Lucio Gonzaga (together, the "Premier Defendants"), Michael DeCarlo and his wife, Dolores, and four Baltimore County employees who had a role in the operations or management of the rec center: Bob Smith, Kevin Parry, Mark Meszaros, and Mary Margaret Fasy (together, the "County Defendants").[8]

The Waltons alleged that several factors contributed to the unsafe conditions that day. According to the Waltons, Field 2 was inadequately lit and therefore unsafe. Moreover, Premier did not have a proper permit to use Field 2 but instead practiced, without authorization, under a permit issued to another team, St. Ursula Soccer. This

---

are reviewing a pretrial grant of summary judgment, we present these facts in the light most favorable to the plaintiffs, as required when reviewing a grant of summary judgment. *See Young Elec. Contractors, Inc. v. Dustin Constr., Inc.*, 459 Md. 356, 382-83 (2018).

[6] To the extent the timing of the amended pleadings and substantive changes made to them are relevant to the issues on appeal, such details will be included as necessary.

[7] The circuit court dismissed the claims against some of the defendants on rulings that were not appealed. Thus, we will not address those claims or identify those parties.

[8] Their specific employment duties are not relevant to the legal issue before us.

5

arrangement was facilitated by Mr. DeCarlo, who had a daughter on Sydney's team and served on the Board of Directors of the Archdiocese of Baltimore Soccer Program. The Waltons alleged that Mr. DeCarlo and his wife instructed Premier players and parents to conceal their affiliation with Premier when practicing at the rec center and advised them to say they were with St. Ursula Soccer if questioned by rec center personnel.

The Waltons further contended that even if the permit was assignable (a disputed point), it authorized the use of Field 1, not Field 2. Because Field 2 was not reserved, rec center personnel had turned off its lights before Premier took the field, allegedly rendering it unsafe for practice.

The Waltons alleged two theories of negligence.[9] The theory relevant here is that the DeCarlos, the Premier Defendants, and the County Defendants "breached the standard of care by intentionally and recklessly directing and allowing Sydney Walton and her Premier . . . team to practice at the [rec center] . . . without first receiving the information about concussions and head injuries required by law" in violation of HG § 14-501.

According to the Waltons: (1) the County Defendants violated the statute by failing to inform Premier of its obligations under the statute; (2) the Premier Defendants violated the statute by failing to provide the Concussion Policies to players and their parents, and failing to require the team's coach to read them; and (3) the DeCarlos enabled the foregoing

---

[9] Although not before us, the Waltons' first theory was that the County Defendants were aware that the lights over Field 2 were malfunctioning and that they, along with the DeCarlos and the Premier Defendants, breached their duties owed to Sydney by allowing Sydney's team to practice on Field 2 when it was inadequately lit and unreasonably unsafe. As stated above, the jury found in favor of the defendants on this issue.

6

statutory violations by allowing Premier to use the rec center with St. Ursula Soccer's permit, and, as a result, the County Defendants did not even know that the Concussion Policies should have been provided to Premier.

At different points in time, the DeCarlos and the Premier Defendants moved for summary judgment on various grounds, including that the Waltons had no evidence that the alleged violations of HG § 14-501 proximately caused Sydney's injuries.[10] In response, the Waltons, relying on *Polakoff v. Turner*, 385 Md. 467, 476 n.5 (2005), argued that proximate cause in a negligence claim under the Statute or Ordinance Rule merely requires evidence that the plaintiff was within the class of people that the statute was enacted to protect, and that the harm suffered by the plaintiff was of the type that the statute's drafters meant to prevent. Notably, however, in neither their second amended complaint nor their summary judgment opposition papers did the Waltons identify the specific information that

---

[10] The DeCarlos moved for summary judgment before the Waltons filed their second amended complaint in which they first asserted their theory based on HG § 14-501. Two months later and days before the hearing, along with the second amended complaint, the Waltons filed a "Notice of Intention to Rely Upon Additional Authorities" disclosing their intention to rely on this new theory at the then-upcoming hearing. At the hearing, without objection, the Waltons, the DeCarlos, and the court discussed the HG § 14-501 theory. The DeCarlos argued that the alleged statutory violation did not proximately cause Sydney's injuries, and the Waltons argued that it did. The court granted the DeCarlos' motion, finding the Waltons provided no evidence that the alleged statutory violation caused the incident.

The Premier Defendants moved for summary judgment before the DeCarlos did, but their motion did not challenge the Waltons' ability to establish proximate cause. They later filed a second motion that did include this argument. The court granted the Premier Defendants' second motion for summary judgment on the morning of the first day of trial. Though the County Defendants never moved for summary judgment on this issue, they benefited when the court granted the Premier Defendants' motion in limine, which precluded the Waltons from introducing evidence to support their HG § 14-501 claim at trial.

they alleged should have been provided under the statute. Nor did the Waltons put copies of such materials in the record.

The circuit court dismissed this theory of negligence on summary judgment. The court determined that to establish proximate cause, the Waltons needed to present evidence establishing that the defendants' failure to comply with HG § 14-501 was the cause-in-fact of Sydney's injuries. Because the court concluded that the Waltons presented no such evidence, it granted the DeCarlos' and the Premier Defendants' motions for summary judgment. The circuit court also granted the Premier Defendants' motion in limine barring the Waltons from introducing evidence at trial to support their theory under HG § 14-501.

After a final judgment was entered, the Waltons timely appealed.

## C

The Appellate Court of Maryland affirmed the judgment of the circuit court, concluding that, even assuming the defendants violated HG § 14-501(b), those violations were merely evidence of a breach of duty. *Walton v. Premier Soccer Club, Inc.*, 261 Md. App. 53, 73-75 (2024). The court agreed with the circuit court that the Waltons failed to come forward with evidence establishing the cause-in-fact component of proximate cause. *Id.* at 75. The court further concluded that even if judicial notice had been taken of the materials developed by the Education Department, such evidence would not have been sufficient to satisfy the Waltons' burden. *Id.* at 78.

**II**

We review an order granting summary judgment without deference. *CX Reinsurance Co. Ltd. v. Johnson*, 481 Md. 472, 484 (2022). We independently review the record "to determine whether a genuine dispute of material fact exists and whether the moving party is entitled to judgment as a matter of law." *Md. Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 694 (2015). In doing so, we confine ourselves to the summary judgment record established under Maryland Rule 2-501. *La Belle Epoque, LLC v. Old Europe Antique Manor, LLC*, 406 Md. 194, 209 (2008). Moreover, with limited exceptions not applicable here, "we review only the grounds upon which the trial court relied in granting summary judgment." *SVF Riva Annapolis LLC v. Gilroy*, 459 Md. 632, 654 (2018) (quoting *Springer v. Erie Ins. Exch.*, 439 Md. 142, 156 (2014)).

**III**

**A**

A negligence claim has four elements: "a duty owed to [the plaintiff] (or to a class of which he is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages." *Jacques v. First Nat. Bank of Md.*, 307 Md. 527, 531 (1986). The phrase "legally cognizable causal relationship," *id.*, is another way of saying "proximate cause," *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*, 335 Md. 135, 156 (1994).

"[N]egligence is a breach of a duty owed to one, and absent that duty, there can be no negligence." *Ashburn v. Anne Arundel County*, 306 Md. 617, 627 (1986) (citing *W. Va. Cent. & Pittsburgh Ry. Co. v. State ex rel. Fuller*, 96 Md. 652, 671 (1903)). Such a duty is

9

referred to as a "tort duty." *Jacques*, 307 Md. at 533-34. Tort duties are "imposed by law as a matter of sound policy[.]" *Id.* at 533. For example, the act of driving a car comes with a duty, imposed by law, to exercise ordinary care, and the breach of that duty will give rise to a negligence claim. *See Kaffl v. Moran*, 233 Md. 473, 477-78 (1964). Driving a car is an easy example; not all interactions or activities give rise to a tort duty to others.

Whether a tort duty exists involves two considerations: "the nature of the harm likely to result from a failure to exercise due care," and the parties' relationship. *Jacques*, 307 Md. at 534. Generally, when the potential harm is economic, no tort duty will exist without "contractual privity or its equivalent" between the parties. *Id.* at 534-35. However, where, as is alleged here, "the risk created is one of personal injury, no such direct relationship need be shown, and the principal [but not sole] determinant of duty becomes foreseeability." *Id.* at 535. The foreseeability requirement protects against the risk of incurring liability for "remote consequences[.]" *Brown v. Dermer*, 357 Md. 344, 358 (2000), *overruled in part on other grounds by Brooks v. Lewin Realty III, Inc.*, 378 Md. 70 (2003), *abrogated on other grounds by Ruffin Hotel Corp. of Md., Inc. v. Gasper*, 418 Md. 594 (2011).

We turn now to the element of proximate cause, which "involves a conclusion that someone will be held legally responsible for the consequences of an act or omission." *Pittway Corp. v. Collins*, 409 Md. 218, 243 (2009) (quoting *Peterson v. Underwood*, 258 Md. 9, 16 (1970)). Proximate cause incorporates two concepts: (1) causation-in-fact; and (2) legal causation. *Id.* at 243. "Causation-in-fact concerns the threshold inquiry of 'whether [the] defendant's conduct actually produced an injury.'" *Id.* at 244 (quoting

10

*Peterson*, 258 Md. at 16-17). One of two tests is used to determine causation-in-fact: the but-for test or the substantial factor test. *Id.* at 244. The but-for test applies when "only one negligent act is at issue[,]" and the substantial factor test applies when "two or more independent negligent acts bring about an injury[.]" *Id.* Under the but-for test, "cause-in-fact is found when the injury would not have occurred absent or 'but for' the defendant's negligent act." *Id.* Under the substantial factor test, "[c]ausation-in-fact may be found if it is 'more likely than not' that the defendant's conduct was a substantial factor in producing the plaintiff's injuries." *Id.*

If the defendant's breach of a tort duty did, in fact, cause the injury, the next step is to determine whether that breach was the *proximate* cause of the injury. That is, we look at "whether the defendant's negligent actions constitute a legally cognizable cause of the complainant's injuries." *Id.* at 245. "Legal causation is a policy-oriented doctrine designed to be a method for limiting liability after cause-in-fact has been established." *Id.* The legal causation requirement is usually satisfied when "the injuries were a foreseeable result of the negligent conduct."[11] *Id.* at 246. The inquiry is whether the plaintiff's injury "falls within a general field of danger that the actor *should have anticipated or expected*." *Id.* at

---

[11] As we noted in *Pittway*, "[o]ther public policy considerations that may play a role in determining legal causation include 'the remoteness of the injury from the negligence [and] the extent to which the injury is out of proportion to the negligent party's culpability[.]'" 409 Md. at 246 (second alteration in original) (internal quotations omitted).

245 (emphasis added). Thus, foreseeability comes into play in two elements of a negligence claim: duty and proximate cause.[12]

The violation of a statute designed to protect a specific class of persons that includes the plaintiff is evidence of negligence.[13] *See, e.g.*, *Brooks*, 378 Md. at 79; *Kiriakos v. Phillips*, 448 Md. 440, 457 (2016). But that alone is not enough: the plaintiff must still establish proximate cause to survive summary judgment.[14] *Hamilton v. Kirson*, 439 Md. 501, 526-28 (2014). Thus, a prima facie case of negligence based on a violation of a statute has two prongs. *First*, the plaintiff must present evidence that the defendant violated a statute designed to protect a specific class of persons that includes the plaintiff. This prong aligns with the duty and breach elements of a negligence claim. *Kiriakos*, 448 Md. at 457-62. *Second*, the plaintiff must present evidence that the violation of the statute proximately caused the plaintiff's injury. This prong satisfies the proximate cause and injury elements. *Hector v. Bank of N.Y. Mellon*, 473 Md. 535, 559 (2021) (citing *Brooks*, 378 Md. at 79).

Although our Court has applied this test for decades, since *Polakoff v. Turner*, we have sometimes called it the Statute or Ordinance Rule. 385 Md. 467, 476 (2005). *See, e.g.*,

---

[12] That said, foreseeability in the duty analysis is determined prospectively based on the facts existing when the negligent act occurred, but foreseeability in the proximate cause context requires a retrospective view of the facts. *Henley v. Prince George's County*, 305 Md. 320, 336-37 (1986).

[13] Because in this case the Statute or Ordinance Rule has been invoked with a statute, our discussion will refer to the statute, although it would be equally applicable to claims based on violations of an ordinance.

[14] *See Absolon v. Dollahite*, 376 Md. 547, 557 (2003) ("[T]he settled rule in Maryland is that a statutory violation is evidence of negligence. It does not constitute negligence *per se*, unless a statute expressly makes it so.").

12

*Blackburn Ltd. P'ship v. Paul*, 438 Md. 100, 111 (2014); *Fangman v. Genuine Title, LLC*, 447 Md. 681, 718 (2016); *Kiriakos*, 448 Md. at 457; *Rogers v. Home Equity USA, Inc.*, 453 Md. 251, 264 (2017); *Hector*, 473 Md. at 559. Although the Statute or Ordinance Rule has been applied in a variety of cases, those involving lead paint poisoning are particularly instructive here. *See, e.g.*, *Brooks*, 378 Md. 70; *Polakoff*, 385 Md. 467; *Allen v. Dackman*, 413 Md. 132 (2010); *Hamilton*, 439 Md. 501; *Rogers*, 453 Md. 251; *Hector*, 473 Md. 535. Indeed, the Waltons rely on one such case, *Brooks v. Lewin Realty III, Inc.*, specifically the bolded and italicized sentence in the following passage:

> [I]n order to make out a *prima facie* case in a negligence action, all that a plaintiff must show is: (a) the violation of a statute or ordinance designed to protect a specific class of persons which includes the plaintiff, and (b) that the violation proximately caused the injury complained of. "***Proximate cause is established by determining whether the plaintiff is within the class of persons sought to be protected, and the harm suffered is of a kind which the drafters intended the statute to prevent.*** * * * It is the existence of this cause and effect relationship that makes the violation of a statute *prima facie* evidence of negligence."

378 Md. at 79 (second alteration in original) (emphasis added) (quoting *Brown*, 357 Md. at 359).[15]

Relying on that sentence, which we will refer to as the "proximate cause sentence," the Waltons insist that to survive summary judgment, their burden was merely to put forth evidence that: (1) Sydney was within the class of persons HG § 14-501 was designed to protect; and (2) HG § 14-501 was intended to prevent the type of injuries Sydney suffered. They maintain they were not required to separately show that the statutory violations were

---

[15] This formulation was then repeated in subsequent cases. *See Polakoff*, 385 Md. at 476; *Blackburn*, 438 Md. at 112; *Hamilton*, 439 Md. at 524.

the cause-in-fact of Sydney's injuries. The Waltons contend that they met their burden and that the circuit court erred in granting summary judgment. The Waltons also argue that the Appellate Court incorrectly interpreted the proximate cause sentence as expressing only the legal causation component of proximate cause. We disagree.

*First*, the Waltons read the proximate cause sentence in isolation. Taken together, each of the sentences in the passage, particularly the last one, makes clear that a cause-and-effect relationship between the statutory violation and the injury is required.[16]

*Second*, the proximate cause sentence gives expression to the foreseeability component of *legal* causation. That is, a plaintiff is foreseeable if she is "within the class of persons sought to be protected" by the statute, and "the harm suffered is of a kind" the statute was meant to prevent. *Brooks*, 378 Md. at 79 (quoting *Brown*, 357 Md. at 359). But we don't get to that step of the analysis unless the breach of duty was a cause-in-fact of the plaintiff's injury. *Pittway*, 409 Md. at 245. The proximate cause sentence, therefore, describes the second step of the analysis; that is, it presumes that the statutory violation did, in fact, cause the injury, and merely tells us whether that cause-in-fact rises to the level of *proximate* cause.

*Third*, if, as the Waltons argue, the proximate cause sentence satisfies the cause-in-fact component of proximate cause, then the proximate cause element in a typical lead

---

[16] Which explains why, in *Blackburn*, we stated that "Respondent must still produce facts that would allow a jury to reasonably conclude that [he] entered the pool because the gate violated COMAR." 438 Md. at 126. In *Blackburn*, suit was brought by the parent of a child who nearly drowned in his apartment complex's pool after he allegedly slipped through the gate that surrounded it. *Id.* at 106.

14

paint poisoning case would never be an issue.[17] That's because we have already held that the relevant housing code provisions were intended to protect children from lead paint poisoning. *See Brown*, 357 Md. at 367 ("Patently, by enacting §§ 702 and 703 of the Housing Code, the City Council sought to protect children from lead paint poisoning by putting landlords on notice of conditions which could enhance the risk of such injuries."). Thus, this Court has already made the two determinations reflected in the proximate cause sentence: (1) children were in the class of people such ordinances were intended to protect; and (2) the injuries from lead paint poisoning were those that the ordinances sought to prevent.

Yet cause-in-fact remains an issue in lead paint cases.[18] One such case was *Hamilton v. Kirson*, where the Court explored how inferences from circumstantial evidence could be stitched together to establish causation-in-fact in a lead paint case. 439 Md. at 527-46. And before *Hamilton*, there was *Ross v. Housing Authority of Baltimore City*, where we held that "the [causal] link between a defendant's property and a plaintiff's childhood exposure

---

[17] By "typical," we are referring to cases such as *Brown*, 357 Md. 344, and *Rogers*, 453 Md. 251, where there was an alleged violation of provisions of a housing code that was enacted to, among other things, protect children from the dangers of lead poisoning.

[18] So too in other types of cases. *See, e.g.*, *Kiriakos*, 448 Md. at 468 ("[U]pon a finding that the social host defendant **knowingly and willfully** allowed a member of the protected class to consume alcohol on the host's premises in violation of the statute, in an action against the social host brought by or on behalf of the minor or, as in the Kiriakos case, by an injured third party, such conduct—*if it substantially contributed to a diminution of the underaged person's ability to act in a reasonable manner, and thereby caused injury*—can be found to be a substantial factor in bringing about the harm to the underage person himself or to a third party." (second emphasis added)).

to lead paint and dust may be established through circumstantial evidence" in the absence of expert testimony. 430 Md. 648, 669 (2013).

More recently, in *Rogers v. Home Equity USA, Inc.*, we provided a roadmap for determining whether a plaintiff's injury is causally connected to the specific property owned by the defendant. 453 Md. 251. From the grant of the defendant's summary judgment motion, the causation issue before us was whether evidence existed that the defendant's property was the source of the plaintiff's lead exposure. *Id.* at 262.[19]

We noted that for a negligence claim based on the Statute or Ordinance Rule, the plaintiff needed to "satisfy both prongs of [that rule] to a reasonable probability." *Id.* at 264. To establish the first prong—that the section of the housing code that was violated was "designed to protect a specific class of persons which includes the plaintiff," *id.* (quoting *Brooks*, 378 Md. at 79)—the plaintiff had to "demonstrate that it is reasonably probable that the subject property contained lead-based paint in violation of the Housing Code[,]" *id.* at 264.

To establish proximate cause, the second prong, the plaintiff had to show that it was "reasonably probable that the lead in the subject property caused his elevated blood lead levels, and that his elevated blood lead levels caused him injury." *Id.* at 265. In other words, it was not enough that the plaintiff was in the class meant to be protected by the housing code and that the housing code was intended to prevent lead paint poisoning. The plaintiff

---

[19] We defined "source causation" as "a reasonable probability that [the plaintiff's] exposure at [the defendant's housing complex] contributed to his elevated blood lead levels." *Rogers*, 453 Md. at 273.

16

still needed evidence that the source of the plaintiff's exposure to the lead paint that caused his injuries was the defendant's property.

We determined that evidence supporting three links in the causal chain was required: "(1) the link between the defendant's property and the plaintiff's exposure to lead; (2) the link between specific exposure to lead and the elevated blood lead levels[;] and (3) the link between those blood lead levels and the injuries allegedly suffered by the plaintiff." *Id.* (alteration in original) (quoting *Ross*, 430 Md. at 668). The shorthand we gave for these links were "(1) source, (2) source causation, and (3) medical causation." *Id.* at 265. And we held that a plaintiff must "demonstrate only a reasonable probability as to each of these links—he is not required to conclusively establish them." *Id.*

We then discussed the "two ways in which a lead paint plaintiff can establish the subject property as a reasonably probable source of his lead exposure and resulting elevated blood lead levels." *Id. First*, a plaintiff could survive summary judgment with evidence that "the subject property is the *only* possible source of the plaintiff's lead exposure." *Id.* (emphasis added). This test correlates to the but-for test for establishing *causation-in-fact*. *See Pittway*, 409 Md. at 244. *Second*, if there were multiple potential sources of lead exposure, the plaintiff could survive summary judgment with "evidence to establish that it is reasonably probable that the subject property contributed to his lead poisoning." *Rogers*, 453 Md. at 266. This test reflects the substantial factor test for *causation-in-fact*. *Pittway*, 409 Md. at 244-45.

The analytical framework established in *Rogers* for determining source and source causation would have been unnecessary if, as the Waltons maintain, a plaintiff could stave

17

off summary judgment merely with evidence that she was in the class meant to be protected by the statute and suffered an injury the statute was meant to prevent. Thus, *Rogers* confirms what we already knew from *Hamilton* and *Ross* (among other cases): An essential component of a negligence claim, including one invoking the Statute or Ordinance Rule, is causation-in-fact, without which there can be no proximate cause.

## B

As a fallback argument, the Waltons maintain that they presented sufficient evidence that the defendants' violations of HG § 14-501 were the cause-in-fact of Sydney's injuries. We disagree. The Waltons presented no evidence that the alleged violations of HG § 14-501 were either the but-for cause of Sydney's injuries or a substantial factor in causing them. This was not by accident: In the circuit court, the Waltons consistently maintained that their burden for proximate cause was nothing more than satisfying the two conditions of the proximate cause sentence. That's how they characterized the claim in their second amended complaint, in their summary judgment opposition papers, and at the hearings on the DeCarlos' and the Premier Defendants' summary judgment motions. The Waltons never put the Concussion Policies in the record.[20]

---

[20] As explained above, *supra* note 10, the Waltons first introduced their theory based on HG § 14-501 in the second amended complaint filed after they had already responded to the DeCarlos' summary judgment motions. But they could have attached the Concussion Policies to the notice they filed with the second amended complaint or submitted them when the court held argument on the motion several days later. And they could have asked for a continuance of the hearing and the opportunity to supplement their response with the Concussion Policies and additional briefing. Instead, at the hearing, the Waltons told the court that the second amended complaint did not "change the arguments today."

18

Indeed, when the Premier Defendants' motion was heard on the morning of the first day of trial, the Waltons' counsel maintained that "traditional proximate cause" does not apply when the Statute or Ordinance Rule is invoked, and that "[t]o get to the jury you only ask two questions, and those two questions are is the statutory scheme designed to prevent the type of injury that happened[]" and "is the person who was harmed within the class of persons that the statute was intended to protect[.]" When pressed by the court to identify the specific information that the statute required, the Waltons' counsel acknowledged that they had not put such information in the record. When the court pressed further, the Waltons' counsel argued that: (1) the Concussion Policies direct coaches to structure practices with safety and concussion prevention in mind; (2) instead of doing so, Coach Gonzaga conducted a full-speed practice on an indoor field with a wooden perimeter wall; (3) the players and parents were not provided appropriate warnings about collision risks; (4) Coach Gonzaga could have run safer drills like passing or circle drills, especially since the season was over; and (5) the Concussion Policies include a matrix instructing coaches to understand their sport and prioritize safety in structuring practices.

Counsel's say-so is not enough to withstand a properly supported summary judgment motion. Under Maryland Rule 2-501,[21] the nonmoving party must identify each

---

[21] Maryland Rule 2-501 provides in part:

***

    (b) **Response.** – A response to a motion for summary judgment shall be in writing and shall (1) identify with particularity each material fact as to which it is contended that there is a genuine dispute and (2) as to each such fact, identify and attach the relevant portion of the specific document,

19

fact in dispute with "particularity" and support its position with evidence that would be admissible at trial. Md. R. 2-501(b), (c); *Rowhouses, Inc. v. Smith*, 446 Md. 611, 631 (2016). Such evidence must be sufficient for a "jury [to] reasonably find for the plaintiff." *Rogers*, 453 Md. at 263 (quoting *Hamilton*, 439 Md. at 523). Thus, the opposing party cannot merely allude to a document if it wants the court to consider it; the party must put the document in the record. Md. R. 2-501(b); *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 738 (1993). Factual details—not "metaphysical doubt" over material facts—are required to generate a dispute of fact. *Beatty*, 330 Md. at 738 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

Here, because the Waltons neither put the Concussion Policies in the summary judgment record nor asked the circuit court to take judicial notice of them, the circuit court had no evidentiary basis to find a dispute of fact on the issue of proximate cause. The court's grant of summary judgment was legally correct.

---

discovery response, transcript of testimony (by page and line), or other statement under oath that demonstrates the dispute. A response asserting the existence of a material fact or controverting any fact contained in the record shall be supported by an affidavit or other written statement under oath.

(c) **Form of affidavit.** – An affidavit supporting or opposing a motion for summary judgment shall be made upon personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit.

## C

Even if the Waltons had included the Concussion Policies in the summary judgment record, it would not have changed the outcome. As the Appellate Court concluded, such evidence would still not satisfy their burden. *Walton*, 261 Md. App. at 78.

The Waltons contend that Sydney collided and hit the wall during a "full speed game-like drill or scrimmage in which the wall was in play and that Sydney collided with another player close enough to the wall that she fell into the wall headfirst." From this, they argue a reasonable jury could conclude "that the practice was not structured with safety in mind or to avoid concussion injuries."

In their brief to this Court, the Waltons attached the Concussion Policies, which "recommend[] specific online training courses that satisfy the requirement for coach's concussion awareness training[.]" The Concussion Policies identify three such programs but merely recommend—not require—that coaches take one of them. A coach could instead take any training program that includes: "Understanding Concussions[;] Recognizing Concussions[;] Signs & Symptoms[; and] Responses and Action Plan." None of these topics necessarily address how to appropriately run a soccer practice.

The Waltons' cause-in-fact argument depends on numerous speculative assumptions: (1) that Coach Gonzaga never received or reviewed the Concussion Policies; (2) that he was not otherwise aware of their substance; (3) that if he had received them, he would have chosen the specific "Heads Up: Concussion in Youth Sports" program offered by the Centers for Disease Control and Prevention (the "CDC") over other permissible options; and (4) that this particular program would have led him to conduct practice

21

differently, thereby preventing Sydney's collision. With no evidence in the summary judgment record from Coach Gonzaga about what program he would have chosen, the Concussion Policies, standing alone, would require a jury to guess, with, at best, a one-in-three chance of being correct.

The Waltons also rely on a CDC "Fact Sheet for Youth Sports Coaches" that was never part of the summary judgment record. But this document contains only general advice, such as to "[c]reate a culture of safety" and "[e]nforce the rules of the sport for fair play, safety, and sportsmanship." Such vague recommendations could be interpreted differently by different coaches based on their individual risk tolerances and coaching philosophies. The materials contain no specific dos and don'ts for a reasonable jury to determine, without rank speculation, whether the materials would have made a difference to *this* coach, on *this* day, and at *this* practice.[22] "[A] jury of laymen [is not permitted to] engage in 'guesswork, speculation and conjecture.'" *Hamilton*, 439 Md. at 528 (quoting *Peterson*, 258 Md. at 21). Here, looking solely to the summary judgment record, that's all the Waltons could have offered the jury.

Moreover, the General Assembly did not contemplate that compliance with HG § 14-501 would prevent all concussions. Both the statute and the Concussion Policies

---

[22] The Waltons' counsel acknowledged at a hearing in the circuit court that this practice occurred after the season had ended. This timing raises additional questions about causation. If compliance with HG § 14-501 would have required providing the Concussion Policies *before* the season's first practice, as common sense would dictate, then: (1) no evidence established such compliance didn't occur; and (2) the team completed an entire season without reported concussions, making it even more speculative to suggest that a statutory violation caused this particular injury during an off-season practice.

22

contain extensive provisions addressing how to handle concussions after they occur and when players may return to play—clear acknowledgment that such injuries remain an inherent risk in sports even with full compliance. *See Am. Powerlifting Ass'n v. Cotillo*, 401 Md. 658, 670 (2007). The statute's purpose was to ensure that coaches, youth athletes, parents, and guardians possess awareness to reduce risk and appropriately handle concussions when they occur, not to eliminate the risk of concussions entirely.[23] Because the statute itself assumes that concussions may occur despite compliance, it would be illogical to permit a jury to speculate that compliance would have prevented Sydney's specific injuries.

> **JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**

---

[23] This is unlike, for example, the code provisions at issue in lead paint poisoning cases. Compliance with ordinances designed to prevent lead paint poisoning necessarily means a property is rid of all lead paint, eliminating that property as a possible source of lead poisoning. In contrast, a violation of HG § 14-501 does not necessarily mean that a coach was not aware of concussion risks or that such awareness would have prevented a collision during play. The causal relationship between violation and injury is far more attenuated here.

Circuit Court for Baltimore County
Case No. C-03-CV-19-004228

Argued: October 2, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 11

September Term, 2024
_____

HOMER WALTON, ET AL.

v.

PREMIER SOCCER CLUB, INC., ET AL.
_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.
_____

Dissenting Opinion by Watts, J.
_____

Filed:   April 24, 2025

Respectfully, I dissent. This case involves the relationship between a request for summary judgment under Maryland Rule 2-501 and application of the Statute or Ordinance Rule, under which a *prima facie* case for negligence is made, and in particular what is necessary to demonstrate proximate cause. In this case, the Majority affirms the grant of summary judgment in favor of Respondents on the grounds that any violation of Md. Code Ann., Health-Gen. ("HG") § 14-501 was not the proximate cause of Sydney Walton's injuries. See Maj. Slip Op. at 2. In doing so, the Majority makes a finding with respect to proximate cause that should have been made by the jury, *i.e.*, the factfinder.

Although the Statute or Ordinance Rule contains a proximate cause requirement, the proximate cause test under the Statute or Ordinance Rule is different from the proximate cause or causation tests employed to determine whether there is a sufficient "cause-in-fact" relationship for a case to be submitted to the jury. In this case, the Waltons' allegations, viewed in the light most favorable to them, the nonmoving party, satisfy both the Statute or Ordinance Rule and the substantial factor test proximate cause tests. As such, I would hold that the Circuit Court for Baltimore County erred in granting summary judgment.

"A trial court may grant summary judgment if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ross v. Housing Auth. of Balt. City, 430 Md. 648, 666-67, 63 A.3d 1, 12 (2013) (citing Md. R. 2-501(f)). When reviewing a trial court's grant of summary judgment, this Court considers "the record in the light most favorable to the nonmoving party and construe[s] any reasonable inferences that may be drawn from the facts against the moving party." Id. at

667, 63 A.3d at 12 (citation omitted).

In Maryland, when a statute or ordinance prescribes a duty, "violation of the statute or ordinance is itself evidence of negligence." Blackburn Ltd. P'ship v. Paul, 438 Md. 100, 111, 90 A.3d 464, 460 (2014) (quoting Brooks v. Lewin Realty III, Inc., 378 Md. 70, 78, 835 A.2d 616, 620 (2003)). In order to establish a *prima facie* case of negligence under the Statute or Ordinance Rule, a plaintiff must "(1) show the violation of a statute or ordinance designed to protect a specific class of persons, and (2) that the violation proximately caused the injury complained of." Kiriakos v. Phillips, 448 Md. 440, 457, 139 A.3d 1006, 1016 (2016) (cleaned up).

The Statute or Ordinance Rule was first announced in Flaccomio v. Eysink, 129 Md. 367, 380, 100 A. 510, 515 (1916), over one hundred years ago. See Blackburn, 438 Md. at 111, 90 A.3d at 470. In Blackburn, 438 Md. at 112, 90 A.3d at 471, quoting earlier decisions in Brooks and Brown v. Dermer, 357 Md. 344, 359, 744 A.2d 47, 55 (2000),[1] we described the Rule and its proximate cause requirement as follows:

> Under this principle, in order to make out a *prima facie* case in a negligence action, all that a plaintiff must show is: (a) the violation of a statute or ordinance designed to protect a specific class of persons which includes the plaintiff, and (b) that the violation proximately caused the injury complained of. "Proximate cause is established by determining whether the plaintiff is within the class of persons sought to be protected, and the harm suffered is of a kind which the drafters intended the statute to prevent. It is

---

[1] In Brooks, 378 Md. at 81, 835 A.2d at 622, we explained that the Statute or Ordinance Rule has historically been used in landlord-tenant cases and that plaintiffs in such cases have satisfied the proximate cause requirement of the Statute or Ordinance Rule by showing that they are within a class of persons designed to be protected by the Housing Code and that the harm suffered flows from a duty or obligation imposed upon landlords by the Housing Code. And in Brown, 357 Md. at 359, 744 A.2d at 55, we applied the test in the lead paint case context.

the existence of this cause and effect relationship that makes the violation of a statute *prima facie* evidence of negligence."

(Asterisks omitted).

This description of the proximate cause requirement was not a fluke. After Blackburn, in Kiriakos, 448 Md. at 462-63, 139 A.3d at 1020, we again explained the Statute or Ordinance Rule and its proximate cause requirement as follows:

> Under the second prong of the Statute or Ordinance Rule, Dankos must show "that the violation proximately caused the injury complained of." *Blackburn*, 438 Md. at 112, 90 A.3d 464 (citations and internal quotation marks omitted). To establish proximate cause in this context, Dankos must show that Steven "is within the class of persons sought to be protected by the statute, and that the harm suffered is of a kind which the drafters intended the statute to prevent." *Id.* (citations and internal quotation marks omitted).

(Brackets omitted).

Under the Statute or Ordinance Rule, to satisfy the second part of the test concerning proximate cause, a plaintiff must show: (1) that the plaintiff is within the class of persons sought to be protected by the statute; and (2) that the harm suffered is the kind of harm that the drafters intended the statute to prevent. With these factors and the first part of the test satisfied, a plaintiff has made out a *prima facie* case of negligence under the Statute or Ordinance Rule. In its opinion, the Appellate Court stated that, even if both parts of the Statute or Ordinance Rule test are met, the plaintiff must still demonstrate that the defendant's actions were the cause-in-fact of their injury, using either the "but for" test or the "substantial factor" test. Walton v. Premier Soccer Club, Inc., 261 Md. App. 53, 74,

311 A.3d 406, 418-19 (2024).[2]  Where a motion for summary judgment challenging whether evidence of causation is sufficient for a case to be submitted to a jury is raised, this is correct.  See Kirakos, 448 Md. at 463, 139 A.3d at 1020; Hamilton v. Kirson, 439 Md. 501, 524, 96 A.3d 714, 728 (2014); Brooks, 378 Md. at 79, 835 A.2d at 621.

In Kiriakos, 448 Md. at 465, 139 A.3d at 1021, after determining that the evidence was sufficient to satisfy the Statute or Ordinance Rule's proximate cause requirement, we

---

[2]The Appellate Court stated that, in order to do this, the Waltons needed to show that if they had received the information outlined in Md. Code Ann., Educ. ("ED") §§ 7-433(b)(1)-(4), Sydney would not have practiced with the team or would have altered her behavior to avoid sustaining a concussion.  See Walton, 261 Md. App. at 77, 311 A.3d at 420.  The Appellate Court stated that the Waltons also could have put on sufficient evidence if they demonstrated that a review of the materials would have prompted Sydney's coach to restructure the team's practice for the purpose of preventing injury.  See id. at 77, 311 A.3d at 420.  Nonetheless, according to the Appellate Court, this material was never part of the circuit court's record.  See id. at 77, 311 A.3d at 420.  The Appellate Court explained that the circuit court repeatedly asked to see a copy of this material during the hearing on the Premier Defendants' second Motion for Summary Judgment; however, the Waltons' attorney advised that the materials were "in the car" and subsequently failed to produce them.  Id. at 69, 311 A.3d at 416.

The Appellate Court took judicial notice of the materials outlined in ED §§ 7-433(b)(1)-(4) after the Waltons included a hyperlink to them in their brief.  See id. at 78, 311 A.3d at 421.  The Appellate Court concluded that, even if the materials were part of the circuit court's record, it would have reached the same result.  See id. at 78, 311 A.3d at 421.  The Appellate Court stated that the materials do not require coaches to restructure team practices for the purpose of preventing concussions.  See id. at 80, 311 A.3d at 422.  The Appellate Court stated that the plain language of the materials suggests that they are intended to help coaches identify when a student is suffering from a concussion and how best to respond.  See id. at 81, 311 A.3d at 432.  Thus, the Appellate Court concluded that there was no causal link between Premiers' failure to provide the material to Sydney's coach and her subsequent injury.  See id. at 81, 311 A.3d at 432.  The Appellate Court stated that the information the Waltons were required to receive was aimed at recognizing the symptoms of a concussion and the importance of reporting the symptoms.  See id. at 81, 311 A.3d at 432.  The Appellate Court concluded that there was no causal link between those materials and Sydney's subsequent injury.  See id. at 81, 311 A.3d at 432.  Therefore, the Appellate Court held that proximate cause did not exist as a matter of law.  See id. at 82, 311 A.3d at 432.

considered whether the evidence was sufficient to survive a motion to dismiss on the issue of causation. In one of two consolidated cases, the petitioner's son was killed while a passenger in a truck driven by a drunk driver, when both had been drinking alcohol at the respondent's home and had become intoxicated before getting into the truck. See id. at 450-52, 139 A.3d at 1012-13. We concluded that, if the jury found facts, such as the respondent knew that the deceased and the driver were intoxicated, the respondent had been informed that the driver would drive despite his state of intoxication, and the respondent did nothing to prevent intoxicated guests from leaving her home by car, the jury could reasonably determine that the respondent "created a force or series of forces which were in continuous and active operation up to the time of the harm[.]" Id. at 471, 139 A.3d at 1025 (cleaned up). We stated that, "[b]y permitting and condoning the decedent's consumption of alcohol, [the respondent] prevented [the decedent] from making an intelligent and informed decision about getting into a vehicle with a drunk driver[.]" Id. at 472, 139 A.3d at 1025. We held that "[a] jury could reasonably conclude that it was more likely than not that [the respondent's] conduct was a substantial factor in causing [the petitioner's son's] death." Id. at 472, 139 A.3d at 1025 (cleaned up). In Kiriakos, 448 Md. at 470, 139 A.3d at 1024, as in Blackburn, we noted that the issue of proximate cause is "ordinarily a jury question."

In this case, the evidence is sufficient to satisfy both the proximate cause test under the Statute or Ordinance Rule and the proximate cause test necessary to survive a motion for summary judgement challenging the sufficiency of the evidence as to causation. HG § 14-501, colloquially known as the "Concussion Awareness Statute," is designed to protect

- 5 -

a specific class of persons: "coaches, youth athletes, and the parents or guardians of youth athletes."[3]  HG § 14-501(b)(1).  Under HG § 14-501(a)(5), the General Assembly expanded the use of the concussion policies to youth sports programs.  HG § 14-501(b)(1) requires that "youth sports programs"[4] disseminate educational materials to coaches, youth athletes, and the parents or guardians of youth athletes concerning the following topics: (1) "the nature and risk of a concussion or head injury"; (2) "the criteria for removal from and return to play"; (3) "the risks of not reporting injury and continuing to play"; and (4) "appropriate academic accommodations for students diagnosed as having sustained a concussion or head injury."  Md. Code Ann., Educ. ("ED") § 7-433(b)(1)(i)-(iv).

HG § 14-501 provides, in pertinent part:

(b)(1) A youth sports program shall make available information on concussions, head injuries, and sudden cardiac arrest developed by the State Department of Education under §§ 7-433 and 7-436 of the Education Article to coaches, youth athletes, and the parents or guardians of youth athletes.

(2) A coach of a youth sports program shall review the information provided in paragraph (1) of this subsection.

(c)(1) A youth athlete who is suspected of sustaining a concussion or other head injury in a practice or game shall be removed from play at that time.

(2) A youth athlete who has been removed from play may not return to play until the youth athlete has obtained written clearance from a licensed health care provider trained in the evaluation and management of concussions.

---

[3]"Youth athletes" are defined as "individual[s] who participate[] in an athletic activity in association with a youth sports program conducted … [b]y a recreational athletic organization."  HG § 14-501(a)(4)(ii).

[4]"Youth sports programs" are defined as "program[s] organized for recreational athletic competition or instruction for participants who are under the age of 19 years."  HG § 14-501(a)(5).

(d) Before a youth sports program may use a facility owned or operated by a local government, the local government shall provide notice to the youth sports program of the requirements of this section.

Here, the parties do not dispute that Sydney is in the class of persons designed to be protected by the Concussion Awareness Statute, nor do they dispute that her coach failed to disseminate the required educational materials. The Majority does not engage in any analysis of whether this aspect of the Statute or Ordinance Rule has been satisfied, stating that "we don't get to that step of the analysis unless the breach of duty was a cause-in-fact of the plaintiff's injuries." See Maj. Slip. Op. at 14 (citation omitted). This is not the analytical process that we followed in Kiriakos, 448 Md. at 465, 139 A.3d at 1021, where we determined that the petitioner had satisfied the Statute or Ordinance Rule and pled a *prima facie* case of negligence and next turned to the issue of whether the proximate cause showing necessary to survive a motion to dismiss had been satisfied.

Regardless of the Majority's hesitancy to admit it, because the Concussion Awareness Statute is designed to protect a specific group of people, youth athletes, from sustaining head injuries while practicing with a youth sports program, and Sydney's team and coach did not comply with the statute's requirements, the first part of the Statute or Ordinance Rule is satisfied and needs no further analysis. As to the second part of the test, the record indisputably shows that Sydney was a youth athlete, a person within the class of people the statute sought to protect, engaged in activity that the statute was designed to protect. Preventing underage persons, *i.e.*, youth, playing sports from incurring concussions is the precisely the harm the statute sought to prevent. The Waltons adequately pled the duty and proximate cause elements of the Statute or Ordinance Rule.

Having determined that the Waltons adequately pled the duty and breach (proximate cause) elements of the Statute or Ordinance Rule, I would turn to whether the claim can survive a motion for summary judgment on the issue of proximate cause. "[A] defendant's negligence is the proximate cause of a plaintiff's injury when the negligence is (1) a cause in fact, and (2) a legally cognizable cause." Kiriakos, 448 Md. at 465, 139 A.3d at 1021(cleaned up).[5] As to the question of cause-in-fact, the substantial factor test is applied when "two or more independent negligent acts" led to a plaintiff's injuries. Kiriakos, 448 Md. at 465, 139 A.3d at 1021.[6] In order to determine whether the substantial factor test has been met, "we ask [whether] it is 'more likely than not' that the defendant's conduct was a substantial factor in producing the plaintiff's injuries." Id. at 465, 139 A.3d at 1021 (quoting Pittway Corp. v. Collins, 409 Md. 218, 244-45, 973 A.2d 771, 787 (2009)) (brackets omitted). We consider several factors taken from the Restatement (Second) of

---

[5] In Kiriakos, 448 Md. at 465-66, 139 A.3d at 10221, we stated:

> Under the second step, legally cognizable cause, we consider whether the actual harm to a litigant falls within a general field of danger that the actor should have anticipated or expected. We have called legal causation a policy-oriented doctrine to limit liability to those instances where the actor deserves to be held liable. In our consideration, we most often—but not exclusively—ask whether the injuries were a foreseeable result of the negligent conduct.

(Cleaned up).

[6]In this case, at least two or more negligent acts are alleged to be the cause of Sydney's injuries. Among the acts alleged to be negligent, the Waltons alleged that Sydney's coach failed to comply with the requirements in HG § 14-501, the field was dimly lit, the team practiced without authorization and the coach allegedly directed Sydney to run at full speed on the dimly lit indoor field. See Walton, 261 Md. App. at 63-64, 311 A.3d at 412-13.

- 8 -

Torts when conducting this inquiry, including "the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it," "whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm," whether the actor's conduct "has created a situation harmless unless acted upon by other forces of which the actor is not responsible," and any "lapse in time" between the two events. Id. at 465, 471, 139 A.3d at 1021, 1024-25.

The Majority's conclusion that the circuit court had no evidentiary basis to find a dispute of fact on the issue of proximate cause because the Waltons did not put the concussion policies into evidence at the summary judgment phase or ask the circuit court to take judicial notice of them is misguided. See Maj. Slip. Op. at 20. As the majority opinion acknowledges, under ED § 7-433(b)(1), "the Education Department was required to 'develop policies and implement a program' addressing: (1) concussion risks; (2) criteria for removal and return to play; (3) risks of not reporting head injuries and of continuing to play after injury; and (4) appropriate academic accommodations for injured students." Maj. Slip Op at 3. The Majority states: "To comply with this obligation, the Education Department published a document entitled 'Policies and Programs on Concussions for Public Schools and Youth Sport Programs' (the 'Concussion Policies')." Maj. Slip Op at 3 (cleaned up). As the Majority explains:

> The requirements of ED § 7-433 and HG § 14-501 are implemented under Title 13A, Subtitle 6, Chapter 8 of the Code of Maryland Regulations ("COMAR"), with the goal of "establishing a program of concussion awareness and prevention throughout the State of Maryland for student-athletes, their parents or guardians, and their coaches." COMAR

13A.06.08.01. COMAR incorporates by reference the Concussion Policies, thus giving such policies the force of any properly promulgated regulation. COMAR 13A.06.08.03.

Maj. Slip Op. at 3 n.1 (brackets omitted).

According to the Majority, at the hearing on the motion for summary judgment in the circuit court, the Waltons' counsel argued among other things that:

(1) the Concussion Policies direct coaches to structure practices with safety and concussion prevention in mind; (2) instead of doing so, Coach Gonzaga conducted a full-speed practice on an indoor field with a wooden perimeter wall; (3) the players and parents were not provided appropriate warnings about collision risks; (4) Coach Gonzaga could have run safer drills like passing or circle drills, especially since the season was over; and (5) the Concussion Policies include a matrix instructing coaches to understand their sport and prioritize safety in structuring practices.

Maj. Slip Op. at 19. There was no dispute between the parties as to the content of the concussion policies; the policies are produced by an agency of the Maryland State Government as a statutory requirement and are readily available to the public and the Court. There was no genuine dispute of fact as to what was contained in the concussion policies; the dispute of fact concerned whether not providing the policies as required by the statute was a substantial contributing factor to Sydney's injuries. Under these circumstances, the failure to provide a link to a website containing the policies or a hard copy of the policies is not a basis on which to grant summary judgment due to an alleged lack of an "evidentiary basis to find a dispute of fact on the issue of proximate cause[.]" Maj. Slip. Op at 20.

That said, I disagree with the Majority's conclusion that the Waltons failed to present sufficient evidence that the defendants' violations of HG § 14-501 were the cause-in-fact of Sydney's injuries. See Maj. Slip Op. at 18. The Majority concludes, "[e]ven if

- 10 -

the Waltons had included the Concussion Policies in the summary judgment record," the Waltons did not satisfy the substantial factor test because the concussion policies "merely recommended" but do not require online training courses that satisfy the requirement for a coach's concussion awareness training and that none of the recommended programs address soccer practices in particular. Maj. Slip. Op. at 21. HG § 14-501(b)(1), however, expressly indicates that "[a] youth sports program *shall* make available information on concussions, head injuries, and sudden cardiac arrest[.]" (Emphasis added). The General Assembly's use of the word "shall" demonstrates that, at minimum, providing the materials is not a discretionary matter; it is mandatory. See Perez v. State, 420 Md. 57, 63, 21 A.3d 1048, 1052 (2011) ("When the Legislature commands that something be done, using words such as 'shall' or 'must' rather than 'may' or 'should,' the obligation to comply with the statute or rule is mandatory.").

And, as the Appellate Court pointed out, in a section of the concussion policies titled "Coach's Education," the concussion policies "require[] that coaches be 'trained in concussion risk and management' including, at a minimum, learning about 'the nature of the risk of a brain injury,' 'the risk of not reporting a brain injury,' and the 'criteria for removal and return to play.'" Walton, 261 Md. App. at 78, 311 A.3d at 421 (brackets omitted). That the concussion policies do not require a specific online program to be taken or address the sport of soccer is of no consequence. HG § 14-501(b)(2) states that "[a] coach of a youth sports program shall review the information provided in paragraph (1) of

this subsection."[7]

In this case, the Waltons produced facts that would allow a reasonable jury to conclude that the defendants' disregard of their obligations under HG § 14-501 was a substantial contributing factor in producing Sydney's injuries.[8] There was sufficient evidence for a reasonable jury to infer that had Sydney's coach been provided the concussion policies, which he was required to review, it is more likely than not that he would have chosen to take any of a number of protective measures while the team played indoor soccer, including having players wear head guards or increasing lighting on the

---

[7]According to the Appellate Court, the information required to be given to youth athletes and their parents consisted of two one-page fact sheets produced by the "Heads Up" program of the Centers for Disease Control and Prevention, to be used for youth athletes and their parents. Walton, 261 Md. App. at 79, 311 A.3d at 421. As the Appellate Court observed, one section of the athlete fact sheet, titled "How can I prevent a concussion?" states:

Every sport is different, but there are steps you can take to protect yourself.

• Use the proper sports equipment, including personal protective equipment.
In order for equipment to protect you, it must be:

   - The right equipment for the game, position, or activity
   - Worn correctly and the correct size and fit
   - Used every time you play or practice

• Follow your coach's rules for safety and the rules of the sport.

• Practice good sportsmanship at all times.

Id. at 79, 311 A.3d at 422.

[8]In their second amended complaint, the Waltons contended, among other things, that Premier Soccer Club violated HG § 14-501(b)(1) by not making information on concussions and head injuries available to Sydney's coach, Sydney, and her parents, and that her coach violated HG § 14-501(b)(2) by not reviewing the required information.

field. Similarly, there was sufficient evidence for a reasonable jury to infer that had Sydney and her parents been provided with the concussion polices they would have made different choices about her participation in the practice, which would have avoided her being injured.

Our precedent does not permit narrowly construing the evidence necessary to satisfy the test for proximate cause (either under the "but for" or substantial factor test) necessary for a negligence case to be submitted to a jury by reaching our own determinations as to what inferences a jury will make or whether the jury's conclusion will be "correct." In my view, this is precisely the path the Majority has chosen to take. See Maj. Slip. Op. at 21-22 (stating that "[t]he Waltons' cause-in-fact argument depends on numerous speculative assumptions" that would require a jury to guess "with, at best, a one-in-three chance of being correct"). In reviewing the grant of a motion for summary judgment, the Court's role is not to predict what a reasonable jury will actually conclude, *i.e.*, what verdict a jury will actually reach, or whether the jury's verdict will be correct.

In this case, the Waltons produced evidence that safety information about concussions was not distributed by the team to Sydney's coach, Sydney, and her parents as required by statute. Because more than one act is alleged to be the cause of Sydney's injuries, the Waltons were not required to demonstrate that "but for" the team's failure to distribute the required information Sydney's injury would not have occurred. The Waltons produced sufficient evidence to demonstrate that it was more probable than not that the defendants' negligence was a substantial contributing factor to producing Sydney's injury. At a minimum, by failing to distribute and read the concussion policies, the defendants prevented both themselves and Sydney and her parents from making intelligent and

informed decisions about the circumstances of the soccer practice and Sydney's participation in it.  See Kiriakos, 448 Md. at 472, 139 A.3d at 1025.  The defendants knowingly allowed the practice to occur at a facility for which the team did not have a proper permit on an allegedly unlit field and without Sydney using protective gear.  A reasonable juror could easily have inferred that had the required information been distributed, a change in the circumstances of the practice would have been made by the team, the coach, Sydney, or her parents that could have prevented the injury to Sydney.

In this case, viewing the evidence in the light most favorable to the nonmoving party, the Waltons have produced sufficient evidence to demonstrate that a reasonable jury could have found more likely than not that the failure to comply with HG § 14-501(b)(1) was a substantial contributing factor to Sydney's injuries.

Respectfully, for the above reasons, I dissent.

The correction notice(s) for this opinion(s) can be found here:

https://www.mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/11a24cn.pdf